**LOUIS GLUNZ BEER, INC., Waukegan Jack Donelson Sales Co., B.B. Distributors, Inc., Grant Importing and Distributing, Southwest Beer Distributors, Schamberger Brothers, Inc., Radakovich Liquor & Beverage Co., Brownstone Beverage Co., and Hartman Beverage Co., Plaintiffs,**

v.

**MARTLET IMPORTING COMPANY, INC., Molson Breweries U.S.A., Inc. and Miller Brewing Co., Inc., Defendants.**

No. 93 C 7552.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 28, 1994.

---

Howard A. Voeks, Godzecki, Zido & Behnke, and Richard A. DelGiudice and Eugene E. Gozdecki, Gozdecki and DelGiudice, Chicago, IL, for plaintiffs.

Michael A. Moses, Richard G. Schoenstadt, Morton Siegel, and James L. Webster, Siegel, Moses, Schoenstadt & Webster, P.C., Chicago, IL, for Martlet Importing Co., Inc. and Molson Breweries USA, Inc., defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs Louis Glunz Beer, Inc., Waukegan Jack Donelson Sales Co., B.B. Distributors, Inc., Grant Importing & Distributing, Southwest Beer Distributors, Schamberger Brothers, Inc., Radakovich Liquor & Beverage Co., Brownstone Beverage, Co., and Hartman Beverage, Co. bring this six-count complaint against Martlet Importing Co., Inc., Molson Breweries U.S.A., Inc., and Miller Brewing Co., Inc., seeking injunctive relief, compensatory damages, and punitive damages. Presently before the court is defendants' motion to dismiss plaintiffs' complaint.[1] For the reasons set forth below, the motion is granted in part and denied in part.

## I. Background

Defendant Martlet Importing Company, Inc. ("Martlet") is a division of defendant Molson Breweries U.S.A., Inc. ("Molson U.S.A."), which in turn is a subsidiary of defendant Miller Brewing Company, Inc. ("Miller"). Miller owns the rights to market all products produced under the "Molson" brand and trademark in the United States, pursuant to a licensing agreement with the Molson Companies, Ltd. the Canadian company which manufactures Molson products.[2]

In 1979, Martlet appointed plaintiff Louis Glunz Beer, Inc. ("Glunz") as the master distributor for all Molson products in Illinois. In this role, Glunz appointed, with Martlet's approval, other beer wholesalers to act as sub-distributors for these products. Some of the plaintiffs in this action were among this original group of sub-distributors, while others became sub-distributors in subsequent years. In 1986, Glunz's role as master distributor was terminated. Instead, Martlet began to deal directly with the former sub-distributors. And although its role as master distributor was eliminated, Glunz retained the right to serve as the exclusive distributor in the territory it had been assigned.[3]

---

1. Although the present motion is only brought by defendants Molson Breweries U.S.A., Inc. and Miller Brewing Co., Inc., the issues resolved herein apply equally to defendant Martlet Importing Co., Inc. Indeed, Martlet has raised as affirmative defenses several of the arguments advanced by the remaining defendants in the present motion. For simplicity's sake, we shall refer to the moving defendants as "defendants."

2. As discussed further below, Miller acquired Molson U.S.A. in January 1993. Prior to that time, Molson U.S.A. was a part of the Molson Companies, Ltd.

3. The parties have never entered into written contracts with respect to the distribution of Molson products, except for the written designation by Martlet of the geographic territory for which

Martlet initially supplied the original Chicago-area Molson distributors with three products: Molson Golden, Molson Canadian, and Molson Ale. Over the years, as Molson Companies introduced new Molson products, Martlet requested that plaintiffs add these products to their portfolios. Plaintiffs allege that it was their obligation, under their agreements with defendants, to agree to these requests and to sell all Molson brand beers that Molson wanted to market in their respective territories. In addition, plaintiffs allege that, as new Molson brands were made available for distribution, Martlet was obligated to appoint plaintiffs to distribute the new products in the plaintiffs' territories.

In January, 1993, Molson Companies announced that it had sold Molson U.S.A. to Miller. This purchase was announced to plaintiffs in a letter from Molson U.S.A. president John Barnett which read in part:

Molson Breweries USA will continue to operate as a stand-alone business—selling, marketing and distributing in the United States, and we plan to continue business as usual with our distributors and customers.

Later that year, in July, 1993, Martlet advised plaintiffs that the Molson brewery planned to introduce a new product called "Molson Ice," and that this new product would be distributed by plaintiffs along with the other Molson products they already handled. A few months later, Martlet sent registration statements to the Illinois Liquor Control Commission designating plaintiffs to be the authorized distributors of Molson Ice in their respective territories, as Martlet had routinely done in the past when introducing new products in the Chicago area.

In October 1993, however, each plaintiff received from Martlet a document entitled "Settlement of Claims and Release," which purported to be in response to each plaintiff's offer to terminate its relationship with Martlet, although none of the plaintiffs had, in

fact, made such an offer to Martlet. At this same time, plaintiffs heard rumors that Miller intended to transfer distribution of all Molson products from plaintiffs to Miller's own distributor network, and that Miller had promised Miller distributors the distribution rights for Molson Ice. Nonetheless, in early November, 1993, upon a request from the Illinois Liquor Control Commission, Martlet resubmitted registration statements for Molson Ice, which again designated plaintiffs as the Molson Ice distributors in their respective territories.

On November 4, 1993, counsel for defendants and plaintiffs agreed to meet on November 19, 1993. In the interim, on November 12, 1993, counsel for defendants advised counsel for plaintiffs that Miller was appointing Doyle Distributing Co., Inc., a Miller distributor, to distribute Molson Ice in Lake County, Illinois.[4] At the November 19 meeting, however, defendants advised the remaining plaintiffs that they had not yet made a decision regarding Molson Ice distribution for the metro Chicago market.

Less than a month later, on December 15, 1993, three Chicago metro area Miller distributors began, at the direction of defendants, marketing Molson Ice in the geographic area for which Glunz had previously been exclusively responsible.[5] On that same day, Glunz received a letter from Martlet advising it that Glunz' distributorship for all Molson products was terminated, effective March 31, 1994. The letter offered no reason for the termination.

With respect to the remainder of the plaintiffs, Martlet refrained from providing them with materials for a midwestern promotion campaign, advising one of the plaintiffs that "under the circumstances" plaintiffs would not be allowed to participate. In addition, Martlet failed to offer price support for the first quarter of 1994, and cancelled several price promotions it had planned for Novem-

each plaintiff was to have exclusive distribution rights.

4. Plaintiff Waukegan Jack Donelson Sales Company had previously been the exclusive distributor of Molson products in Lake County.

5. Defendants first withdrew the registration

ber and December.[6] Furthermore, Osco Drug Store, one of plaintiffs' most significant customers, did not schedule any December, 1993 promotions for Molson products, contrary to its usual practice. Martlet is responsible for negotiating with Osco regarding its participation in promotions. Defendants have not, however, terminated any distributorship other than Glunz'.

Plaintiffs filed the present lawsuit seeking damages and injunctive relief, to prevent defendants from appointing beer wholesalers other than plaintiffs as distributors for Molson Ice in the Illinois territories in which each plaintiff has previously been the exclusive distributor, and to prevent defendants from depriving plaintiffs of their distribution rights for all Molson products.

## II. Motion to Dismiss Standard

A motion to dismiss should not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Beam v. IPCO Corp.,* 838 F.2d 242, 244 (7th Cir.1988); *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). We take the "well-pleaded allegations of the complaint as true and view them, as well as reasonable inferences therefrom, in the light most favorable to the plaintiff." *Balabanos v. North Am. Inv. Group, Ltd.,* 708 F.Supp. 1488, 1491 n. 1 (N.D.Ill.1988) (citing *Ellsworth* ).

## III. Discussion

### A. Coverage of the Beer Industry Fair Dealing Act

▮ Count I of plaintiffs' complaint asserts various violations of the Beer Industry Fair Dealing Act (BIFDA), 815 ILCS 720/1 *et seq.* Defendants move to dismiss this count, arguing that plaintiffs' relationship with defendants is not covered by BIFDA, since that statute only applies to agreements which are entered into after August 19, 1982. 815 ILCS 720/10. This issue, however, was largely resolved by Magistrate Judge Lefkow in ruling on plaintiffs' motion for a preliminary injunction. Specifically, she found that the plaintiffs essentially entered into new agreements with defendants in 1986, when Glunz ceased acting as master distributor and Martlet began dealing with each plaintiff as an individual distributor. Because the contractual relationships between the parties were significantly altered, Magistrate Judge Lefkow concluded, BIFDA came into play. *See* Report and Recommendation at 20–21 (Apr. 4, 1994); Report and Recommendation at 2–3 (Sept. 19, 1994). *See also Northwest Lincoln–Mercury v. Lincoln–Mercury Div. Ford Motor Co.,* 158 Ill.App.3d 609, 110 Ill. Dec. 633, 636, 511 N.E.2d 810, 813 *appeal dismissed,* 116 Ill.2d 562, 113 Ill.Dec. 303, 515 N.E.2d 112 (1987). We agree with Magistrate Judge Lefkow's analysis, and therefore adopt it here. Accordingly, we reject defendants' arguments that BIFDA does not apply in the present action.

▮ Defendants next maintain that, even if BIFDA does apply, Count I must be dismissed with respect to all plaintiffs but Glunz. Defendants assert that the non-Glunz plaintiffs are essentially complaining about defendants' failure to select them to distribute Molson Ice in the Chicago area. Defendants argue, however, that "[i]nasmuch as 'Molson Ice' is a new brand, it has never been the subject matter of the parties' agreement," and plaintiffs therefore have no right to distribute it. Accordingly, they argue that, even if they were to appoint only Miller distributors to distribute Molson Ice, there would be no violation of BIFDA. We disagree. In their complaint, plaintiffs allege that the understanding and practice of the parties gave rise to a set of mutual obligations with respect to new Molson products. Specifically, plaintiffs allege that, as new products became available, plaintiffs were required to distribute those products in their respective territories, and Martlet was required to appoint plaintiffs to do so. In short, plaintiffs have alleged that the right to distribute *all* new Molson products was in fact a part of the agreement between the

statements which had identified plaintiffs as distributors of Molson Ice.

6. Martlet had shared in promotion costs with plaintiffs and offered price supports in the past.

parties. If this is the case, then appointment of Miller distributors in plaintiffs' territories would constitute a violation of BIFDA. *See* 815 ILCS 720/5.[7] Accordingly, defendants' motion to dismiss the BIFDA claims is denied.[8]

## B. Fraud

■ Defendants next move to dismiss plaintiffs' fraud claim. Plaintiffs assert that defendants represented, through various means, that plaintiffs would continue to serve as the exclusive distributors for Molson products, including Molson Ice, in their respective territories. In reliance upon these promises, plaintiffs claim that they "continued to invest substantial efforts of time and other resources to promote all the Molson Products." Cmplt. at ¶ 109. However, plaintiffs assert, these statements were false, in that Miller intends to turn over distribution of all Molson products to Miller distributors.[9] Accordingly, plaintiffs maintain that they have stated a claim for fraud. We disagree.

As a general rule, under Illinois law, "misrepresentations of intention to perform future conduct, even if made without a present intention to perform, do not generally constitute fraud...." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 29, 545 N.E.2d 672, 682 (App. Ct.1979) (citation omitted). However, an exception to this rule exists "if the false prom-

ise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *Id.* (internal quotations omitted). Further, to warrant application of this exception, a plaintiff must demonstrate

(1) a promise or representation was a deliberate fraud by which a party has been induced to act to his damage; and (2) the existence of the fraud relied upon was shown by something more than just a broken promise.

*Mechanical Rubber & Supply, Co. v. American Saw & Mfg. Co.*, 810 F.Supp. 986, 998 (C.D.Ill.1990). In any event, it is axiomatic that one element of a successful fraud claim is that the plaintiff reasonably relied upon the representation to his detriment. *See Arca v. Colonial Bank & Trust Co.*, 202 Ill.Dec. 148, 152, 637 N.E.2d 687, 691 (Ill. App.Ct.1994). It is at this step that plaintiffs fatally stumble. The only injury or detrimental reliance plaintiffs claim is that the alleged misrepresentation "lull[ed] Plaintiffs into continued full-out efforts on behalf of Molson products" until defendants' unilateral termination of plaintiffs' distributorships. However, as plaintiffs allege in paragraph sixteen of their complaint,

[t]he understanding of Plaintiffs regarding discontinued products that has evolved from their custom and practice with Martlet is the same as that concerning the entire line of Molson products: namely

---

7. Defendants indirectly suggest that an agreement covered by BIFDA must identify the *particular* brand or brands of beer at issue. BIFDA, however, does not include such restrictive language. Section 1.1 defines "agreement" to cover "any contract ... pursuant to which a wholesaler has been granted the right to purchase, resell and distribute any brand or brands of beer offered by a brewer." Defendants have cited no cases, and we are not aware any, which hold that the agreement must *specifically* identify the brand(s) covered, or which state that an agreement to distribute, for example, any brands "offered now or in the future," falls outside the scope of BIFDA.

8. We note that it appears that defendants have only granted Molson Ice distribution rights to Miller distributors, or at all, in Glunz' and Waukegan Jack Donelson Sales Co.'s respective territories. Accordingly, the remaining plaintiffs can not state a claim under section 5 of BIFDA, at least at the present time. Indeed, only Glunz

and Donelson allege violations of section 5. Those same plaintiffs allege that the appointment of Miller distributors for Molson Ice in their respective territories *constitutes a cancellation of* their respective agreements, in violation of sections 3 and 4 of BIFDA. In addition, Glunz maintains that termination of his distributorship violates those same sections of BIFDA. The remaining plaintiffs, in addition to Glunz and Donelson, assert a claim under sections 1.1(9), 2, 3, and 4 of BIFDA, asserting that *the withdrawal of* promotional support by defendants constitutes a "partial and effective termination" of the parties' agreements. Defendants, however, have not challenged the latter three claims in the present motion, except to generally argue that BIFDA does not apply, and we therefore do not address them here.

9. In support, plaintiffs note that Glunz' distributorship has been terminated, and that Miller distributors have been employed to distribute Molson Ice in Donelson's territory.

that Plaintiffs will use their best efforts to market each "Molson" brand product as it is introduced, and will continue to seek sales for the product unless and until it is mutually agreed with Martlet to withdraw the product.

Cmplt. ¶ 16. In short, plaintiffs allege that they were obligated, pursuant to an implied contract with defendants, to use their "best efforts" to sell all Molson products. As a result, the "injury" caused by the alleged fraud was nothing of the sort. Plaintiffs cannot claim that they were fraudulently induced to do something that they were obligated to do in any event. *Sinclair v. State Bank of Jerseyville,* 207 Ill.App.3d 430, 152 Ill.Dec. 516, 518, 566 N.E.2d 44, 46 (citations omitted), *appeal denied,* 139 Ill.2d 605, 159 Ill.Dec. 117, 575 N.E.2d 924 (1991). Because plaintiffs have not alleged that they relied *to their detriment* on the alleged misrepresentations, their fraud claim must be denied.

## C. Failure to Join Indispensable Parties

■ Defendants assert that the Miller distributors who have been given distribution rights in Glunz' and Donelson's territories are necessary and indispensable parties. Because joinder of those distributors would defeat jurisdiction, defendants claim, this action must be dismissed. This issue is covered by Fed.R.Civ.P. 19. That rule provides, in relevant part:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest....

(b) Determination by Court Whenever Joinder not Feasible. If a person described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19. In the present action, plaintiffs are seeking injunctive relief requiring defendants to appoint them as distributors of Molson Ice. Because defendants have already granted distribution rights to Miller distributors in Glunz' and Donelson's territories, however, defendants maintain that success for plaintiffs would expose them to inconsistent obligations, and would prejudice the distribution rights of the Miller distributors. Accordingly, defendants argue, the test of Rule 19(a) is clearly met. We agree; if feasible, the Miller distributors should be joined to finally determine the rights to distribute Molson Ice, at least in the presently disputed territories.

That, however, is only half the battle for defendants. As noted above, joinder is not feasible in this case; to join the Miller distributors, all of whom are residents of Illinois, would destroy diversity, and leave this court without subject matter over this dispute. We therefore turn to part (b) of the Rule, and consider whether, in "equity and good conscience" this matter may proceed without those distributors. The Eighth Circuit considered a similar fact pattern in *Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.,* 564 F.2d 816 (8th Cir.1977). There, the defendant, Valley West, granted plaintiff Helzberg's a lease in its shopping mall. Included in the lease was a provision which stated that Val-

ley West would not lease premises for more than three full line jewelry stores, including to plaintiff. Valley West subsequently entered into an agreement with Lord's Jewelers, which made Lord's the fourth full line jewelry store in the mall. Helzberg's sued Valley West, asserting breach of its own lease agreement. Valley West maintained that Lord's was a necessary and indispensable party under Rule 19, and moved to dismiss. The district court denied the motion, and the Eighth Circuit affirmed. The court noted that the requirements of (a)(1) & (2) were met, but that joinder was impossible. It then considered whether Lord's was an indispensable party, as set forth in Rule 19(b), and concluded that it was not. Specifically, the court held:

> It seems axiomatic that none of Lord's rights or obligations will be ultimately determined in a suit to which it is not a party. Even if, as a result of the District Court's granting of the preliminary injunction, Valley West should attempt to terminated Lord's leasehold interest in space 261 in the Valley West Mall, Lord's will retain all of its rights under its Lease Agreement with Valley West. None of its rights or obligations will have been adjudicated as a result of the present proceedings, proceedings to which it is not a party. Therefore, we conclude that Lord's will not be prejudiced in any way contemplated by Rule 19(b) as a result of this action.

> Likewise, we think that Lord's absence will not prejudice Valley West in any way contemplated by Rule 19(b).... It is true that the obligations of Valley West to Helzberg, as determined in these proceedings, may be inconsistent with Valley West's obligations to Lord's. However, we are of the opinion that any inconsistency in those obligations will result from Valley West's voluntary execution of two Lease Agreements which impose inconsistent obligations rather than from Lord's absence from the present proceedings.

*Id.* at 819 (citations omitted). The same analysis applies with equal force here. The Miller distributors will not lose any rights or remedies to which they are entitled, were we to grant plaintiffs injunctive relief in this action. Their entitlement to such rights and/or remedies will not, and can not, be determined in this action. In addition, any prejudice to defendants would be solely a result of their entering inconsistent obligations: an ongoing obligation to use plaintiffs as distributors for all Molson products on the one hand, and a potentially conflicting distribution agreement with Miller distributors for Molson Ice on the other. As a result, this is not a case in which dismissal under Rule 19 is appropriate.

### D. Breach of Contract and Unjust Enrichment

▮ Finally, defendants level several attacks at plaintiffs' contract-based claims. First, they maintain that any contract with Glunz was terminable at will, and defendants' termination of Glunz therefore can not constitute breach of contract. Plaintiffs do not dispute that their agreements with defendants, which are executory and of indefinite duration, are terminable at will. *See Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 671 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). They maintain, however, that defendants acted in bad faith in terminating Glunz. Even in a terminable at will contract, a party may not be terminated where the termination is made in bad faith. *Id.* at 669–70. However, a simple allegation of bad faith will not suffice; to succeed, the plaintiff must allege facts which would support an inference amounting to fraud, or demonstrate that the defendant acted in an arbitrary or capricious manner. *See id.* at 670; *Capital Options Inv., Inc. v. Goldberg Bros. Commodities, Inc.,* 958 F.2d 186, 189 (7th Cir.1992) ("Contractual discretion must be exercised reasonably and not arbitrarily or capriciously. The term 'good faith' refers to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting.") (citations and internal quotation marks omitted). We have already concluded that plaintiffs are unable to state a claim for fraud. Indeed, plaintiffs suggest that the basis for their allegation of "bad faith" is that defendants are taking advantage of the "years of effort Plaintiffs have put into building the Molson brand in

the Chicago market." However, this allegation, while it may support a claim for unjust enrichment, as discussed further below, is simply insufficient to maintain an allegation of bad faith. Defendants provided Glunz with over 100 days notice, and then terminated him, pursuant to a terminable at will contract, to allow established Miller distributors handle the distribution of Molson Ice. Under these circumstances, we conclude that Glunz can not state a claim for breach of contract based on the implied covenant of good faith and fair dealing.[10]

▪ Defendants next suggest that all of plaintiffs' breach of contract claims must be dismissed because they violate the Statute of Frauds. Specifically, defendants maintain that contracts which can not be performed within the course of one year are unenforceable unless in writing. 740 ILCS 80/0.01 et seq. However, as both parties acknowledge, the agreements between the parties were terminable at will, subject to the implied covenant of good faith and fair dealing. Accordingly, because either party could terminate the relationship in good faith within one year, the statue is not implicated. *See Mead v. Chicago & N.W. Ry. Co.*, 189 Ill.App. 323 (Ill.App.Ct.1914) (a contract which can be terminated at any time by either party is not within the Statute of Frauds).

▪ Defendants also generally challenge plaintiffs' breach of contract claim, stating that a party can not recover under an implied contract where an express contract exists. Defendants suggest that plaintiffs have alleged the existence of an express agreement between the parties, and their implied contract claim is therefore preempted. However, defendants fundamentally misunderstand the nature of plaintiffs' claims. That is, plaintiffs allege that they had express agreements with defendants regarding the *fact* of their distributorships, and the assignment of their respective territories, but that the remainder of their relationship with defendants was governed by custom and practice. The existence of an express contract will bar a claim under an implied contract theory only where the two alleged contracts cover the same thing. *See Board of Directors of Carriage Way Property Owners Association v. Western Nat'l Bank*, 139 Ill. App.3d 542, 94 Ill.Dec. 97, 101, 487 N.E.2d 974, 978 (1985). In the present case, the agreements being sued upon arose out of the course of dealing and practice of the parties, as well as the written agreements. Specifically, as discussed above, plaintiffs maintain that the implied contract between the parties provided that plaintiffs would serve as the exclusive distributors for all Molson products, and that Molson would provide customary promotional support to plaintiffs. There is no overlap between the areas putatively covered by this implied contract and the express and/or written agreements between the parties. Accordingly, there is no basis for defendants' claim that the implied contract claim is precluded.

▪ The same is true of plaintiffs' unjust enrichment claim. As the court in *Carriage Way* noted:

> While in an implied contract the existence of the agreement between the parties is determined by a consideration of their acts and conduct, in quasi-contract, the obligation arises not from an agreement but from some relations between the parties or from a voluntary act of one of them. The action is maintainable wherever one party has benefits from the services of another under circumstances in which, according to the dictates of equity and good conscience, he ought not to retain such benefits.

*Id.* 94 Ill.Dec. at 101, 487 N.E.2d at 978 (citations omitted). Here, plaintiffs assert that it would be inequitable for defendants to receive the benefits of plaintiffs' years of service without providing some just compensation for the good will which plaintiffs have garnered on defendants' behalf. This claim exists entirely apart from plaintiffs' implied contract claim, as plaintiffs assert no contractual or custom-based entitlement to such remuneration. We question whether plaintiffs can actually succeed on such a claim; for

---

10. This holding, of course, has no impact on Glunz' BIFDA claim, since BIFDA requires good cause and an opportunity to cure prior to termination. *See* 815 ILCS 720/4.

motion to dismiss purposes, however, the claim survives.

## IV. Conclusion

For the reasons set forth above, defendants' motion to dismiss Count II (Breach of Implied Contract) with respect to Glunz and Count V (Fraud) with respect to all plaintiffs is granted. Defendants' motion is otherwise denied.[11] It is so ordered.

See also 780 F.Supp. 554.

---

11. Defendants have also moved to strike plaintiffs' request for injunctive relief. Plaintiffs have read this portion to apply to plaintiffs' request for *preliminary* injunctive relief, *see* Plaintiffs' Memorandum in Opposition, at 17, and defendants have not countered this reading. As the motion for preliminary injunction has already been ruled on by Magistrate Judge Lefkow, this portion of defendants' motion appears to be moot. However, even if defendants intended their argument to apply to plaintiffs' requests for permanent injunctive relief, we would deny the motion. In their complaint, which is the only relevant document in considering a motion to dismiss, plaintiffs have alleged that Molson products amount to up to 6% of their total sales, that loss of these products would cause some plaintiffs to go out of business, that defendants' refusal to provide promotion and cost support constitutes a partial and effective termination of the distribution agreements, that Molson brands are "door-opening" brands, vital to plaintiffs' portfolios, and that failure to give plaintiffs Molson Ice would result in a significant loss of goodwill and sales. Under these circumstances, and on the face of the complaint, we are unable to conclude that plaintiffs' claim for injunctive relief is deficient. *See Reinders Bros., Inc. v. Rain Bird Eastern Sales Corp.,* 627 F.2d 44, 53 (7th Cir.1980) (finding of irreparable injury despite finding that defendant's products represented only four percent of sales, based on loss of goodwill). *See also Kenosha Liquor Co. v. Heublein, Inc.,* 895 F.2d 418, 420 (7th Cir.1990) (suggesting that "magnet brands" have value beyond actual sales, but that such value must be supported by relevant data). Based on Magistrate Judge Lefkow's Reports and Recommendations, it is not at all clear that plaintiffs will ultimately be able to establish irreparable injury. For the present time, however, the requests for permanent injunctive relief remain.